J-S36005-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ANTHONY JOE FENTON | : | |
| | : | |
| Appellant | : | No. 1304 WDA 2024 |

Appeal from the Judgment of Sentence Entered August 12, 2024
In the Court of Common Pleas of McKean County
Criminal Division at No(s): CP-42-CR-0000299-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ANTHONY JOE FENTON | : | No. 1376 WDA 2024 |

Appeal from the Judgment of Sentence Entered August 12, 2024
In the Court of Common Pleas of McKean County
Criminal Division at No(s): CP-42-CR-0000299-2021

BEFORE: PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY PANELLA, P.J.E.: **FILED: December 23, 2025**

This is a consolidated cross-appeal from the judgment of sentence entered by the McKean County Court of Common Pleas on August 12, 2024. On appeal, Fenton challenges the trial court's rulings on certain pretrial motions, admission of evidence of "prior bad acts", as well as the sufficiency

_____

[*] Retired Senior Judge assigned to the Superior Court.

of the evidence. The Commonwealth challenges the calculation of time-served credited to Fenton. After careful review, we modify the judgment of sentence in part, and affirm in all other respects.

On May 10, 2021, Fenton was charged by criminal complaint with aggravated assault, simple assault, and recklessly endangering another person, related to the assault and death of his girlfriend ("Victim"). On June 2, 2021, the Commonwealth filed an amended criminal complaint, adding a charge of criminal homicide.[1]

On July 15, 2021, Fenton filed a motion to compel discovery, admitting the Commonwealth had provided him with "several hundred pages of discoverable materials, including police reports, recordings, some medical records, and some photographs," but that the Commonwealth had "failed to produce numerous additional discoverable items, including photos of the alleged victim, photos of the alleged injuries of the victim, an overlay of a boot print, etc." Motion to Compel Discovery, 7/15/21, at 1. Fenton asserted he was made aware of these items when they were introduced at a preliminary hearing, but that he had not received copies of them. *See id.* at 2.

On August 13, 2021, the court entered an order directing the Commonwealth to turn over all body camera footage to the defense, and

_____

[1] Fenton subsequently filed a petition for habeas corpus, requesting the court to dismiss these charges based on insufficient evidence. The court denied the petition on November 8, 2021, after a hearing.

directing the parties to file briefs regarding the duty of the Commonwealth, as part of discovery, to provide copies of all photographs in their possession. In his brief in support of the motion to compel, Fenton provided an itemized list of requested materials, which included "Any records or evidence related to the search of telephones and/or online accounts—there is a search warrant authorizing search of these materials but no additional documents or evidence have been provided." Brief in Support of Motion to Compel Discovery, 9/2/21, at 2. Relevantly, during its investigation, the Commonwealth obtained a search warrant for Fenton's cellphone, which was on his person on the day of the incident and used to call 911. The Commonwealth filed a response in which they detailed all of the ways in which they had complied with producing discovery to the defense. *See* Commonwealth's Brief on Photographs, 9/3/21.

The trial court issued an order granting Fenton's motion to compel, specifically listing numerous items to be provided to the defense, relevantly including, "If it exists, records obtained as the result of a search of [Fenton]'s telephone and/or online account(s)." Order, 9/21/21, at 2.

On November 1, 2021, Fenton filed a motion to suppress evidence, including three separate grounds for suppression: (1) Fenton's statements resulting from unlawful detention, and for failure to advise him of his *Miranda*[2] warnings, (2) Fenton's statements during an interview with police

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).

following his request for counsel, and (3) evidence obtained through a search warrant, namely his boots. Following a hearing in February 2022, and subsequent submission of briefs at the court's direction,[3] the court entered an opinion and order denying the motion to suppress on October 31, 2022.

On January 3, 2022, after more than one continuance by defense request, the court entered an order stating Fenton had rejected a guilty plea on the last day to plea, and scheduling the matter for jury trial.

On April 19, 2022, Fenton filed a second motion to compel discovery. Relevantly, Fenton asserted he had made "numerous requests for either the production of a report including a digital copy of [Fenton]'s cell phone which was retained as part of this investigation, or release of this property to the Defense for further testing and investigation, as it is asserted that there could be potentially exculpatory evidence on said phone." Motion to Compel, 4/19/22, at 2. Fenton explained the Commonwealth had provided him with a report that stated an attempt to have the phone forensically tested had been unsuccessful, and had later been advised by the Commonwealth in February 2022 that "the phone is at the lab." *Id.*

At a May 13, 2022 hearing on the second motion to compel, Fenton expressed that it was important for him to find out what was on the phone. *See* N.T., Pre-Trial Conference / Motion to Compel Discovery, 5/13/22, at 3,

---

[3] Fenton filed his brief in support of the motion to suppress evidence on July 20, 2022, and thereafter filed an amended brief on August 1, 2022.

8. Fenton indicated he wanted either the phone or the phone records and was willing to assist with the search of the phone by either receiving the phone back or providing possible passcodes to the Commonwealth. ***See id.*** at 3-4, 9. The Commonwealth clarified that the phone was still in the process of being downloaded at the Pennsylvania State Police Lab and that, at that time, the only way to get into the phone was a method called the "chip-off method,"[4] which destroys the phone. ***See id.*** at 5-6. The Commonwealth wanted to try to get a passcode first to avoid destroying the phone, but stated a passcode already given by Fenton had not worked. ***See id.*** at 6. The Commonwealth indicated that if the matter were already scheduled for trial they would do the "chip-off" method as a last-ditch effort, but that an update for otherwise extracting the data for the phone was expected. ***See id.*** at 6. Fenton agreed preservation of the phone was preferred and agreed to provide another possible passcode that day. ***See id.*** at 10. Fenton clarified if the passcode still did not work, he did not object to the "chip-off" method. ***See id.***

Following the hearing, the court entered an order denying the motion to compel, finding any pending discovery requests regarding the cellphone could be resolved without court intervention, but based on the agreement of the parties, directing as follows: 1) Fenton was to immediately provide possible

---

[4] The "chip-off method" is an advanced data extraction technique that involves physically removing flash memory chips from a mobile device and then acquiring the data using specialized equipment. ***See*** https://www.fletc.gov/jtag-chipoff-smartphones-training-program.

passcodes to unlock the phone to the Commonwealth; 2) if the passcodes did not unlock the phone, the Commonwealth could utilize the "chip-off method" to search the phone; and 3) copies of any data recovered from the Commonwealth's search was to be provided to Fenton. Order, 5/19/22.

On July 20, 2022, Fenton filed a motion for return of property for his cellphone, explaining the Commonwealth informed him that the passcodes provided by Fenton were incorrect, and that the Commonwealth had not yet completed the "chip-off" method. Without holding a hearing, the court entered a November 1, 2022 opinion and order directing the Commonwealth to complete the search of Fenton's phone and return it to him no later than December 19, 2022. Order, 11/1/22.

The Commonwealth filed an appeal from this order to this Court. We vacated the court's November 1, 2022 order, finding the court erred by not holding an evidentiary hearing on the motion for the return of property, and remanded for the trial court to conduct such a hearing. ***See Commonwealth v. Fenton***, 1388 WDA 2022 (Pa. Super. filed Oct. 6, 2023) (unpublished memorandum).

Following remand, and after a status conference was continued at Fenton's request, Fenton filed another motion to compel discovery and request for sanctions on January 16, 2024, requesting the Commonwealth be directed to complete the "chip-off" method and provide him with access to any records recovered therefrom, or alternatively return his property to him.

On January 17, 2024, the court entered an order denying the motion to compel discovery and request for sanctions, explaining that it was bound by this Court's October 6, 2023 decision, which vacated the trial court's prior order granting the request for discovery sanctions and remanded for an evidentiary hearing on the request for return of property; and that it held such a hearing and determined that "the subject cellphone is derivative contraband and, therefore, the Commonwealth is entitled to retain it." Order, 1/17/24.

The next day, Fenton filed a motion for reconsideration of the motion to compel discovery / motion for sanctions. The same day, the court again ordered that "the subject cellphone is derivative contraband and, therefore, the Commonwealth is entitled to retain it," based on its finding "by a preponderance of the evidence of a nexus between criminal activity and the property." Order, 1/18/24 (citing to **Commonwealth v. Howard**, 931 A.2d 129 (Pa. Cmwlth. 2007), which this Court had cited in our October 6, 2023 memorandum).

On February 1, 2024, Fenton filed a motion to continue trial, asserting there was "unresolved discovery related to the contents of [Fenton]'s cellular telephone, which are believed to contain exculpatory evidence, which has not been provided to the defense for review in preparation for the upcoming homicide trial." Motion to Continue Jury Trial, 2/1/24, at 1. The Commonwealth filed a response in which it explained the District Attorney had expressed her position that although she was not "keen about the

continuance, she understood defense counsel's position and, since the defense asserts information may be on the phone that would assist the defense, the District Attorney would not oppose the request to continue with all time to count toward the defense." Commonwealth's Answer to Defense Motion to Continue, 2/2/24, at 1. The Commonwealth clarified, however, that they had "taken substantial steps and continue to do so to obtain the information as the record indicates including several different labs and obtaining search warrants. There is renewed hope with the phone being at the FBI lab. The defense was requested to provide the correct passcode and has failed to do so." *Id.* at FN1. Based on the agreement of the parties, the trial court continued trial until May 28, 2024, noting the time associated with the continuance would run against Fenton. *See* Order, 2/2/24.

On May 17, 2024, the Commonwealth filed a motion *in limine* to introduce evidence, including evidence of Victim's statements about Fenton's abuse, Fenton's prior convictions, and Fenton's assault on a prior intimate partner. Fenton filed a response opposing the motion.

On May 21, 2024, Fenton filed a motion *in limine* seeking to exclude testimony at trial related to the admission of certain evidence regarding his boot tread marks matching markings on Victim's body.

On May 22, 2024, Fenton filed a motion to dismiss pursuant to Pennsylvania Rule of Criminal Procedure 600, arguing "there was substantial delay in the proceedings resulting from the Commonwealth's lack of due

diligence." Motion to Dismiss Pursuant to Pa.R.Crim.P. 600, at 2. Specifically, Fenton contended the delay caused by the Commonwealth's appeal to this Court was "both unnecessary and facilitated by the Commonwealth's failure to follow a prior court order, which would be a lack of diligence." *Id.*

Following a hearing on the motion to dismiss on May 24, 2024, the court entered an opinion and order denying the motion, noting the issue regarding Fenton's cellphone was addressed in prior opinions and orders, *see* Opinion and Order, 5/24/24, at 1, and concluding that because this Court had found the Commonwealth's appeal had merit, the trial court could not find the Commonwealth did not act with due diligence, since they had raised a valid appellate issue. *See id.* at 2.

On May 28, 2024, the court entered an order granting the Commonwealth's motion *in limine* in part. The court withheld a decision on the remainder of the Commonwealth's requests, as well as Fenton's requests in his motion *in limine*, until offers of proof and argument were held at trial.

On June 10, 2024, following a five-day jury trial, a verdict was entered finding Fenton guilty of all charges. Notably, Fenton's version of events was that Victim had fallen down the stairs of their apartment building the night before, which led to her injuries, and accidental death. The Commonwealth presented testimony to rebut this "stair fall" explanation, including testimony from family members regarding Fenton's past abuse of, and threats to, Victim, as well as testimony and expert medical opinions from medical professionals

who observed Victim either at the scene or subsequent to her death. On August 12, 2024, the trial court sentenced Fenton to an aggregate term of 18 to 36 years' incarceration, plus 1 year of consecutive probation, with credit for time served of 1,160 days.

On August 20, 2024, Fenton filed a motion to modify sentence, opposing certain costs imposed on him at sentencing. The next day, the Commonwealth filed a post-sentence motion, asserting Fenton's time served from November 16, 2023 until the present should not be credited toward the instant case because he was still serving a sentence of 30 days to 18 months' incarceration, for an assault conviction that occurred while he was incarcerated, for which he was sentenced on November 16, 2023.

Following a hearing on October 2, 2024, the court entered an order denying the Commonwealth's post-sentence motion, determining "that at the time of sentencing in 299 CR 2021 the court deducted 30 days of time credit and attributed them to the sentence at 403 CR 2023 and that, that deduction was proper." Order, 10/2/24. The court also entered an order that same day denying Fenton's motion to reduce the costs billed to him. These timely appeals followed.

As Fenton has been assigned as the designated appellant, we address his issues first. Fenton raises the following issues on appeal:

> 1. Did the trial court abuse its discretion in denying [Fenton]'s motion to dismiss pursuant to Pa.R.Crim.P. 600?

2. Did the trial court err in denying [Fenton]'s motion to suppress evidence, specifically statements made by [Fenton] after implying that he wished to have counsel and admissibility of photos of [Fenton]'s boots asserted to have been obtained in violation of the Municipal Police Jurisdiction Act?

3. Did the trial court abuse its discretion in admitting "prior bad acts" testimony to be presented at the time of trial, including prior alleged crimes between [Fenton] and the alleged victim as well as prior convictions involving [Fenton] and an unrelated female?

4. Was sufficient evidence presented at the time of trial to support a verdict of guilty for the charge of Criminal Homicide[, third-degree murder]?

Appellant's Brief, at 8 (unnecessary capitalization and suggested answers omitted) (renumbered to be consistent with presentation in argument section).

**Rule 600**

In his first issue, Fenton argues the trial court abused its discretion in denying his pretrial motion to dismiss pursuant to Rule 600. Our standard of review of a trial court's denial of a Rule 600 motion is as follows:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters ... courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Faison*, 297 A.3d 810, 821 (Pa. Super. 2023) (citation, brackets, and emphasis omitted).

Generally, under Rule 600, the Commonwealth must bring a defendant to trial within 365 days of filing the criminal complaint. *See* Pa.R.Crim.P. 600(A)(2)(a).

In a Rule 600 analysis, the "mechanical run date" is 365 days after the complaint was filed. The "adjusted run date" is then calculated by adding any time that is "excluded from the computation" under Rule 600(C)(1). If a defendant is not brought to trial by the adjusted run date, the case is dismissed.

*Commonwealth v. Malone*, 294 A.3d 1247, 1249 (Pa. Super. 2023) (citations omitted). In determining the adjusted run date, Rule 600 further explains:

periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

Pa.R.Crim.P. 600(C)(1); *see also* Pa.R.Crim.P. 600, cmt. ("If the delay occurred as the result of circumstances beyond the Commonwealth's control and despite its due diligence, the time is excluded.") (citations omitted).

Importantly, we note that in 2012, the Pennsylvania Legislature enacted the new Rule 600, as outlined above, effective as of July 1, 2013. The general dictates of the new Rule 600 remained the same as they were prior to adoption, but the prior distinctions between excludable time and excusable delay were abandoned for a streamlined review of the Commonwealth's due diligence, with a failure to exercise due diligence being considered "includable time." *Commonwealth v. Wiggins*, 248 A.3d 1285, 1289 (Pa. Super. 2021) (citation omitted).

Our Supreme Court recently explained that the first sentence of Rule 600(C)(1) provides "the general rule" and establishes "two requirements that must be met for delay to count toward the 365-day deadline: (1) the Commonwealth caused the delay and (2) the Commonwealth failed to exercise due diligence." *Commonwealth v. Lear*, 325 A.3d 552, 560 (Pa. 2024) (citations and internal quotation marks omitted). The *Lear* Court clarified that "the causation analysis precedes the due diligence inquiry, and it is only when

the Commonwealth both caused the delay and lacked due diligence that the delay is properly included in the Rule 600 calculation." *Id.* at 560 n.7.

"Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010) (citation omitted). Due diligence must be demonstrated by a preponderance of the evidence. *See Wiggins*, 248 A.3d at 1289. Rule 600 "expressly calls upon a trial court to assess the Commonwealth's due diligence throughout the life of a case, when faced with a claim that the Commonwealth violated a defendant's speedy trial rights." *Commonwealth v. Harth*, 252 A.3d 600, 617 (Pa. 2021).

Addressing the second sentence of Rule 600(C)(1), the *Lear* Court explained that "'any other periods of delay' — meaning any periods of delay not caused by the Commonwealth or not resulting from the Commonwealth's lack of due diligence — are 'excludable' and are removed from the computation of the Rule 600 deadline." *Lear*, 325 A.3d at 560 (brackets and citation omitted).

Fenton asserts "the trial court heard no evidence or testimony from the Commonwealth at [the Rule 600] hearing and that the Commonwealth was essentially relieved of its burden of proving that it acted with due diligence throughout the course of proceedings." Designated Appellant's Brief, at 37.

At the Rule 600 hearing, Fenton asked the court to take judicial notice of the entirety of the docket in this matter, including the file date of May 10, 2021, and the jury trial date of May 28, 2024. *See* N.T., Rule 600 Hearing, 5/24/24, at 2. The Commonwealth stated it did not object, except for noting an error on the docket regarding a February 1, 2023, motion for status conference that was attributed to the defense, but which was actually a Commonwealth motion. *See id.* The court thereafter took judicial notice of the docket with the exception noted above. Fenton then asked the court to take notice of all filings and orders on the docket, specifically highlighting three orders: (1) the court's May 19, 2021 order denying Fenton's motion to compel, but directing the Commonwealth to complete the "chip-off" method if the passcodes given by Fenton did not work, (2) Fenton's July 20, 2022 motion for return of property, and (3) the court's November 1, 2022 opinion and order that was later vacated by this Court. *See id.* at 3. Upon questioning by the court, Fenton conceded the issue regarding the cell phone was initiated by a defense motion. *See id.* at 4.

The court highlighted that it was the defense's motion regarding the cell phone that put the issue on the record. *See id.* The court noted that both parties wanted this issue resolved before trial, particularly the defense, and therefore "hearings had to be held, evidence presented, arguments made." *Id.* The court conceded it issued a ruling which ended up being wrong, and noted that the Commonwealth had the right to file their appeal, and that there

was no delay in processing the appeal, although it did take some time. *See id.* The court stated that based on those documented circumstances, it could not find the Commonwealth acted without due diligence. *See id.* at 5. The court found "any period of delay to address the issue that the Defense raised, runs against the Defense" and therefore stated it was denying the motion.

Fenton argued a request for discovery does not toll Rule 600, and that the Commonwealth cannot survive a due diligence argument for any period of judicial delay. *See id.* at 5-6. Fenton further argued that the court's May 19, 2022 order stopped the request that had been initiated by the defense, and that the Commonwealth's failure to follow that order was a lack of due diligence despite the fact that the Commonwealth ultimately pursued and succeeded on an appeal. *See id.* at 6. Accordingly, Fenton argued the Commonwealth had not exercised due diligence based on the fact that they did not complete the "chip-off" method, and that any time attributable to that failure cannot count towards Fenton. *See id.* at 7.

The court responded that "there's more to it than that" and clarified that it was not "as simple as the Commonwealth had something in their file, they just didn't turn it over and the Defense had to file a motion." *Id.* The court specified it was accepting the testimony that was presented in the prior hearings by the Commonwealth that it was very difficult to search the phone. *See id.* at 7-8. Accordingly, the court concluded the Commonwealth had acted with due diligence in both "searching the phone … [a]nd in appealing [the

court's] incorrect ruling so that the matter could be addressed legally, appropriately." *Id.* at 8. The court concluded the hearing after the Commonwealth stated it had nothing else to add. *See id.*

The testimony attributable to the Commonwealth at the hearing is admittedly sparse. However, the Commonwealth agreed to the court taking judicial notice of the entire record, specifically including the numerous hearings, motions, and orders that had been filed and held on this very matter, including this Court's remand for a hearing on this issue. As the record on this issue had been thoroughly developed, as summarized by the court at length, there was simply not much for the Commonwealth to add to the discussion, as the court was able to make a determination from the robust record on this very matter, due to the court being actively involved in the numerous filings and hearings attributed to this phone issue.

Based on that record, the court determined that any time spent on the phone issue was attributable to the defense. Based on *Lear*, it is questionable whether the court had to even get to the due diligence inquiry once it determined the Commonwealth was not the cause of the delay. *See Lear*, 325 A.3d at 560 n.7 (clarifying "the causation analysis precedes the due diligence inquiry, and it is only when the Commonwealth both caused the delay and lacked due diligence that the delay is properly included in the Rule 600 calculation."). However, even if we assume, *arguendo*, that the Commonwealth at least contributed to the cause of the delay, our review

reflects that the trial court, in its disposition of Fenton's Rule 600 motion, properly addressed whether the Commonwealth had demonstrated it acted with due diligence. *See* Opinion and Order, 5/24/24, at 2. Based on the evidence presented at the hearing, including the record evidence that the Commonwealth stipulated to, the trial court did not abuse its discretion in denying the motion to dismiss.

## Motion to Suppress Evidence

In his second issue, Fenton argues the trial court erred in denying his pretrial motion to suppress evidence. On appeal, Fenton challenges the court's ruling related to (1) his statements to police after he requested counsel, as well as (2) his boots, which were obtained through a search warrant.

We begin with our scope and standard of review:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the trial court's conclusions of law are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

*Commonwealth v. Krenzel*, 209 A.3d 1024, 1027-28 (Pa. Super. 2019) (brackets and citation omitted).

Here, following a hearing and consideration of submitted briefs, the court entered an order denying the motion to suppress, along with an opinion setting forth the following findings of fact:

On May 10th, 2021, Chief Michael Ward of the Bradford City police Department (BCPD) responded to a report of a medical emergency occurring at 117 Main Street, Bradford, Pennsylvania. BCPD is close to 117 Main Street, thus Chief Ward immediately responded on foot. He went up the stairs to [Fenton]'s apartment and entered. Inside, he observed [Fenton] talking on a cellphone attempting to render CPR to a female on the floor. The female appeared to be in "serious medical distress." Shortly after, the emergency medical technicians (EMTs) arrived in the apartment and began to administer aid to the woman. Chief Ward and [Fenton] exited the bedroom under the instruction of the attending EMTs. Upon their initial response, the EMTs asked [Fenton] basic questions regarding the identity of the woman and for details regarding her condition and any possible injuries that she may have sustained. Chief Ward noticed some discrepancies in the answers that [Fenton] was providing regarding how the woman ended up in her condition. For example, [Fenton] initially stated that he had not seen the woman since the prior day/evening, however, his following statement to the EMT stated that he had woken up beside[] her and she collapsed. [Fenton] began to insist on exiting the apartment to "get some fresh air." Chief Ward responded with "yeah in a second; you need to be here if [the EMTs] have questions." [Fenton], however, got up and exited the apartment, stating that he needed to leave.

Chief Ward followed [Fenton] down the steps and onto the sidewalk in front of the entrance to the apartment. Chief Ward continued to communicate with [Fenton] and ask him questions. [Fenton] was emotionally distraught. Chief Ward asked "what is your name?" [Fenton] responded with "Tony Finton," as well as a false date of birth. Chief Ward testified that he was asking [Fenton] questions to obtain information to assist the EMTs in providing care for the female, Tammy Prosser, who was in clear medical distress.

Shortly after [Fenton] and Chief Ward exited the apartment, and at 12:45 p.m., BCPD Officer Jason Putt arrived. Chief Ward instructed Officer Putt to "get information" on [Fenton] so they could "run it." Chief Ward then left the area where Officer Putt and [Fenton] were standing. While the two were standing on the sidewalk, Officer Putt asked [Fenton] for his name and basic identifying information. He also asked for the name of the woman in the apartment who was receiving medical treatment. While he was speaking with him, [Fenton] was not in handcuffs, was smoking a cigarette and moving around in that area. [Fenton] remained very emotionally upset and provided little information to Officer Putt.

After a short time, Chief Ward returned to the area where Officer Putt and [Fenton] were located. Chief Ward, with Officer Put[t] standing to the side, asked [Fenton] some additional questions about what had occurred. Chief Ward then stated: "Jay [Jason] you be out here, okay." Although he was making the statement to Officer Putt, [Fenton] apparently believed that Chief Ward was talking to him, and, [Fenton] responded: "I'm not going to run."

Chief Ward the[n] returned to the room. He observed the female and concluded that her condition had worsened and was very serious. He observed that the swelling and bruising around the woman's neck was rapidly intensifying. He testified that, at that point, he concluded that "something was afoul here" and [Fenton] was not providing accurate and full information regarding what had occurred. After about ten minutes, Chief Ward exited the apartment and returned outside and stood near [Fenton]. [Fenton] then asked Chief Ward if he could go back into the apartment and Chief Ward responded that he could not, and, he "can sit down" if he wished.

At 1:11 p.m. [Fenton] can be viewed on Chief Ward's body camera footage attempting to walk away from the front of the apartment. When Chief Ward noticed [Fenton] was leaving, he instructed him to remain where he is and he advised him that he is being held for "investigatory detention," and, that they need to obtain facts about what had happened to Tammy Prosser.

At 1:17 p.m. Chief Ward advised [Fenton] he was being taken to the BCPD station. [Fenton] was placed in handcuffs and walked to the BCPD Station by Chief Ward and another officer.

When they arrived at the station, the handcuffs were removed. [Fenton] was asked to remove his belt and his boots and he was placed in a holding cell. Chief Ward testified that it was protocol for individuals placed in a holding cell to remove their belt and shoes, to prevent self-harm. Approximately 4 hours after being placed in the holding cell, [Fenton] was taken to a conference room at the BCPD Station. Chief Ward and Detective Ryan Yingling were present. Chief Ward began the encounter by reading [Fenton] his *Miranda* rights. However, before he could finish them, [Fenton] began to speak. Chief Ward interrupted [Fenton] and told him that he had to wait to speak until after he read through all the *Miranda* warnings. [Fenton] then, after the *Miranda* rights were fully read, signed a waiver of his rights.

Shortly after questioning started, [Fenton] stated: "I don't know if I should do this. I think that ... I think that I should probably get a lawyer because, I mean, I just don't know what to do." Chief Ward responded that it was up to [Fenton] whether to obtain an attorney and he could not give him any guidance on what to do. Chief Ward and Detective Yingling both indicated that any statements given had to be voluntary. [Fenton] then indicated that he wanted to provide a statement and he spoke, unprompted, for several minutes. He described "bite marks" that would be found on Tammy Prosser, explaining that she has a "sexual thing." He also stated: "I think I should wait to see if she lives or dies, because if she dies, I'm going to be looking at a murder charge …." He provided an explanation of how Tammy Prosser was injured. He asserted that, the night before, he and Ms. Prosser "were heading to Tops to buy some beer;" and, "were already drunk from finishing the first fifteen pack of beer." He asserted that Ms. Prosser "fell down the steps" after tripping over a rug on the steps.

After [Fenton] indicated during the interview that he felt like he was still intoxicated, Detective Yingling asked him if he would provide a breath sample for a portable breath test (PBT). [Fenton] agreed and the BAC result was 0.00. When Chief Ward asked [Fenton] whether the information that had been relayed to this point was "truthful" and "accurate," [Fenton] answered that he "was not to the point where [he] did not [understand] what [he] was saying." Chief Ward testified that he believed [Fenton] was coherent and understood what was occurring during the interview.

- 21 -

At 7:00 p.m., [Fenton] advised Chief Ward and Detective Yingling that he wanted to end the interview and asked if he "can go back to his cell." Before Chief Ward or Detective Yingling responded, [Fenton] began speaking again. At 7:05 p.m. [Fenton] stated: "I feel like I shouldn't say another word until I get a lawyer, because I've already incriminated myself way too much, and I don't even know why …." In response to this statement, Detective Yingling advised [Fenton] that, when he talks about getting a lawyer, it makes them (the interviewers) "pause." In response, [Fenton] indicated that he was willing to talk to Chief Ward and Detective Yingling more, if he could smoke a cigarette and have some water.

During the interview, Chief Ward and Detective Yingling informed [Fenton] several times that his statements must be voluntarily made and that he was not required to speak if he did not want to. Chief Ward testified [Fenton] was fully cooperative during the interview in responding to the questions posed by himself and Detective Yingling. Following the interview, [Fenton] was advised that he was being placed under arrest.

On May 19th, 2021, roughly nine days following the interview of [Fenton] at the BCPD station, Officer Jason Putt applied for a search warrant for [Fenton]'s boots. [Fenton]'s boots were initially held at the BCPD station, but were transported to the McKean County Jail in Smethport, PA, which is in Keating Township, McKean County, Pennsylvania. The application was submitted to Magisterial District Judge William Todd. District Judge Todd's jurisdiction covers Keating Township, which is where the McKean County Jail is located and where [Fenton] and his boots were being held. Officer Putt testified that, after speaking with Corporal Andy Dalton, of the Pennsylvania State Police, he concluded that the search warrant should be filed with Magisterial Judge Todd at his office in Smethport. Chief Ward testified that, after the boots were taken at the station when [Fenton] was placed in a cell, he had reviewed photographs of the injuries sustained by [V]ictim and there appeared to be boot marks on her body. Therefore, he directed Officer Putt to obtain a search warrant for [Fenton]'s boots so the treads on them could be compared to the marks on Tammy Prosser's body.

Opinion and Order, 10/31/22, at 1-6 (footnote omitted).

_Request for Counsel_

Fenton first argues his two requests related to counsel were clear and unambiguous, and that continued interviewing without permitting him to obtain counsel was a violation of his Constitutional rights.

Regarding the right to counsel, this Court has previously explained:

In **Miranda** [], the United States Supreme Court established that an accused has the right to have counsel present during custodial interrogations under the Fifth and Fourteenth Amendments to the United States Constitution. This right to counsel is part of a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination.

In **Edwards v. Arizona**, [451 U.S. 477, 484–85 (1981)], the Supreme Court addressed the consequences of a suspect's invocation of the right to counsel. The **Edwards** court held that when an accused has invoked his right to have counsel present during custodial interrogation, police may not conduct further interrogations until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. If police conduct further interrogations outside the presence of counsel, the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

To trigger these protections, a defendant's request for counsel must be sufficiently clear "that a reasonable police officer would understand the statement to be a request for an attorney." **Davis**[ **v. United States**, 512 U.S. 452, 454 (1994)]. In **Davis**, police officers were investigating a murder that occurred after the victim lost a pool-game bet and refused to pay. Naval criminal investigators focused on Davis when they discovered that he had been at the bar on the evening in question and owned a pool cue that was stained with blood. Davis was brought in for questioning, provided his rights, and waived his rights to remain silent and to counsel. During the interview, Davis said, "Maybe I should talk to a lawyer." In response, the criminal investigator reminded him of his right to counsel and asked Davis to clarify whether he wanted

a lawyer. Davis responded that he was not asking for a lawyer and did not want one. However, one hour later, Davis said, "I think I want a lawyer before I say anything else," at which point investigators ended the interrogation.

The **Davis** Court declined to disturb the conclusion of the lower courts that Davis's "maybe" statement was insufficiently clear to invoke his right to counsel. The Court rejected the argument that an equivocal or ambiguous reference to counsel requires the police to stop questioning a suspect:

> We decline petitioner's invitation to extend **Edwards** and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney. The rationale underlying **Edwards** is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation. But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning "would transform the **Miranda** safeguards into wholly irrational obstacles to legitimate police investigative activity," because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present. Nothing in **Edwards** requires the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer.

The Court went on to conclude that while it will often be good police practice for the interviewing officers to clarify whether or not [a suspect] actually wants an attorney, the officers need not do so; instead, they may continue questioning until and unless the suspect clearly requests an attorney.

The inquiry into whether or not a suspect has invoked the right to counsel is an objective one. The **Davis** Court explained that a suspect "must articulate his desire to have counsel present **sufficiently clearly that a reasonable police officer in the circumstances would understand the statement be a request for an attorney**." However, if the statement is "ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might*

be invoking the right to counsel," police are not required to cease questioning.

***Commonwealth v. Champney***, 161 A.3d 265, 272–73 (Pa. Super. 2017)

(footnotes and some citations omitted) (emphases in original).

Here, the trial court found Fenton's statements were not clear and unambiguous requests for counsel, explaining:

> [Fenton] indicated that he didn't know what to do and was considering his options, not that he had made the decision to get an attorney. The situation is analogous to an individual on a hot summer day standing on a large rock over a lake, deciding whether to jump and stating: "I don't know, it's pretty far down there." But, then he jumps. Once he is in the air the decision has been made, whether wise or not. Here, [Fenton] expressed doubt, but then started talking. The talking demonstrated that he had made his decision to jump and start talking, his actions demonstrated what he had decided to do. His initial reluctance was a question, not a conclusion. Chief Ward and Detective Yingling did not unduly influence him or impose trickery.
>
> In fact, they repeatedly explained that it was his choice. Therefore, [Fenton]'s statements were voluntary and there is no basis for suppression. The same holds true regarding [Fenton]'s later expression of doubt and confusion as to whether he should continue to make statements. He questioned himself as to whether he should continue to speak with the officers, but then voluntarily decided, as evidenced by his continued talking and participation, to continue. Therefore, there is no basis for suppression.

Opinion and Order, 10/31/22, at 13-14.

We agree with the trial court's determination that Fenton's statements regarding thinking about getting a lawyer were not clear and unequivocal requests for counsel. We reject Fenton's suggestion that the following circumstances are comparable: Fenton expressing that he wanted a drink, and

Chief Ward getting up immediately to get him a drink, but when Fenton made comments about wanting an attorney, nobody got up and followed up with the request the way Chief Ward did with the water. *See* Designated Appellant's Brief, at 45. We reiterate that our case law does not require the provision of counsel to a suspect who consents to answer questions without the assistance of a lawyer, and that while it may be argued that it is good practice for officers to clarify whether or not a suspect actually wants an attorney, *the officers are not required to do so*. **See Champney**, 161 A.3d at 273. Notably, the officers here made it clear to Fenton that it was up to him whether or not to choose to seek counsel and that they would not make that decision for him, and Fenton willingly continued to talk with them. No relief is warranted.

<u>Search Warrant for Boots</u>

Next, Fenton argues a search warrant and subsequent seizure of his boots was completed by an officer who was outside of his jurisdiction and in violation of the Municipal Police Jurisdiction Act ("MPJA"), 42 Pa.C.S.A. §§ 8951, *et seq.*

The MPJA provides in pertinent part:

**(a) General rule.**—Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

...

(1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served.

…

(4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

42 Pa.C.S.A. § 8953(a)(1), (4).

Our Court has recognized that technical violations of the MPJA's probable cause requirement set out in Section 8953(a) do not always warrant the suppression of inculpatory evidence. *See **Commonwealth v. O'Shea***, 567 A.2d 1023, 1030 (Pa. 1989) (approving a case-by-case determination of the appropriateness of excluding evidence obtained in violation of Section 8953 of the MPJA, depending on all the circumstances, including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the MPJA, and the prejudice to the accused). Notably, Fenton acknowledges that suppression of evidence is not always the appropriate remedy for a violation

of the MPJA, and cites to **O'Shea** for its case-by-case approach. **See** Designated Appellant's Brief, at 49. Despite this concession, Fenton offers no explanation for why any of the factors to be considered in such an analysis do not apply here, i.e. all the circumstances of the case including the intrusiveness of the police conduct, the extent of deviation from the letter and spirit of the MPJA, and the prejudice to the accused.

Conversely, the trial court thoroughly addressed the factors provided for in **O'Shea**, and concluded as follows:

> Even if Corporal Dalton lacked authority to grant approval, or the record here failed to reflect that he had granted approval, suppression would still not be warranted. As discussed in the cases cited above, including [] **O'Shea**, [] 567 A.2d [at] 1029-30 []; **Commonwealth v. Saul**, 499 A.2d 358, 361 [(Pa. Super. 1985)]; and, **Commonwealth v. Havnes**, 577 A.2d 564, 570 (Pa. Super. 1990), suppression is only warranted when a violation implicates fundamental, constitutional concerns, was conducted in bad faith or substantially prejudice the accused in the sense that the search would not otherwise have occurred or would not have been as intrusive. None of the applicable reasons to exclude the evidence would apply in this situation. The search was not conducted in bad faith, as Officer Putt followed proper protocol to go about executing the warrant. The evidence would have likely been seized anyways, as Officer Putt could have simply received the warrant the next day or next occasion that the Sergeant was on-duty; and the search did not violate any fundamental, constitutional concerns because, again, the evidence would have been seized regardless of when the warrant was executed. Therefore, there is no basis for suppression.

Trial Court Opinion, 10/31/22, at 18. We agree. Even if we assume *arguendo*, that a violation of the MPJA occurred here, we do not find suppression was warranted under the circumstances. Again, no relief is warranted.

**"Other Bad Acts" Evidence**

In his third issue, Fenton argues the trial court erred by allowing "other bad acts" testimony to be admitted at the time of trial. Specifically, Fenton challenges the court's admission of the following evidence: (1) Victim's statements in her diary, (2) Victim's parent's testimony that Fenton made a statement in the past about kicking Victim down the stairs to kill her, and how she would at least get to see her parents one last time, and (3) testimony from his ex-girlfriend about his prior abuse of her. **See** Designated Appellant's Brief, at 52-53.

Our standard of review for challenges to the admissibility of evidence is well settled:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abuses its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Tyson***, 119 A.3d 353, 357-58 (Pa. Super. 2015) (*en banc*) (citations and quotation marks omitted).

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

***Commonwealth v. Aikens***, 990 A.2d 1181, 1185 (Pa. Super. 2010) (citation omitted). Further, to establish an exception set forth in Rule 404(b)(2), there must be "a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question[.]" ***Commonwealth v. Gilliam***, 249 A.3d 257, 272 (Pa. Super. 2021) (citation omitted).

*Victim's Statements in her Diary*

Preliminarily, we note that the trial court ruled the Commonwealth could offer Victim's statements from her diary based on the state of mind exception to the hearsay rule, Pa.R.E. 803. ***See*** Order on Motions in Limine, 5/28/24, at 1. The court instructed the jury as such, providing them with a limiting instruction that the diary was introduced for the sole purpose of giving Victim's state of mind, and not for any other purpose. ***See*** N.T., Jury Trial – Day 2, 5/29/24, at 22. Despite the fact that Fenton utilizes his brief arguing that the trial court erred in admitting this evidence pursuant to Pa.R.E. 404, and any exceptions thereto, we will not consider that argument on appeal because that was not a basis for the admission of this evidence. As Fenton does not develop any argument related to the diary based on the state of mind exception to the hearsay rule, we find he has waived any argument related to the diary.

*Fenton's Statements About Kicking Victim Down the Stairs*

On May 22, 2024, the parties appeared for a hearing on the motions *in limine*. The Commonwealth broke down the evidence it sought to admit into the following categories: victim statements, defendant statements,

observations from others, and defendant's prior history. *See* N.T., Motion in Limine Hearing, 5/22/24, at 1-2.

Regarding Fenton's statements to others, defense counsel conceded "some of [Fenton]'s statements are obviously going to be admissible and they're going to be credibility determinations." *Id.* at 20. Specifically, defense counsel asserted that "[i]f there is a proffer from the, let's say the parents of the alleged victim … that said he specifically threatened to kick her in the head and it's contemporaneous to this time, we would understand the [c]ourt's going to rule that's admissible … This is certainly a jury question as to whether they believe that statement was made." *Id.* at 20-21. Defense counsel then differentiated between statements by Fenton made closer in time to Victim's death about hitting her in the neck or chocking her, which "would be admissible," *id.* at 22 ("I don't have legal grounds to argue that a statement that clearly related to what we're here for would be admissible."), and statements provided from a longer time period ago that are not related to the specific incident in question. *See id.* at 21-22 (giving as an example Fenton threatening Victim for running out of beer long before her death).

Following the above discussion, the court indicated, "I believe his statement – I believe his statements are going to come in, absen[t] an objection at trial that tells me otherwise. I believe his statements are most likely to come in." *Id.* at 24. Following the hearing, the court ordered as such,

ruling the Commonwealth could introduce Fenton's statements to others. *See* Order on Motions in Limine, 5/28/24, at 1.

At trial, Victim's mother testified that both herself and Victim were born with neurofibromatosis – a tumor on the side of the head, and that Victim had seen doctors about this growth since 1996. *See* N.T., Jury Trial – Day 2, 5/29/24, at 13-15. The mother testified that Fenton knew about the vulnerability of Victim's tumor and had previously stated "one swift kick and that would be the end of you," after which "he sort of giggled." *Id.* at 15-16. Victim's father also testified about this interaction that occurred at his home, when Victim and Fenton came to visit. *See id.* at 41. At the time they had no place to live, so he offered them the back room if they cleaned it up, but they did not want to do that. *See id.* The father relayed that Fenton turned to Victim and "[made] a comment, well you can see your parents at least the last – one last time. … And then he[, Fenton], goes well, one good push down the steps, because we had our steps to our apartment that were steep, and it came out onto the porch. And he says, well, then that ought to solve my problem." *Id.* Defense counsel did not raise any objection to this evidence coming in, and cross-examined the father at length about these statements. *See id.* at 50-53.

Our review of the record shows that Fenton did not preserve an objection to this particular statement's admissibility. *See* Pa.R.E. 103(a) (providing a party seeking to claim error in a ruling to admit evidence must

make a "timely objection, motion to strike, or motion *in limine*" and "states the specific ground, unless it was apparent from the context"). It was the Commonwealth who filed the motion *in limine* to admit this statement. While Fenton also filed a motion *in limine* to exclude evidence, it did not address this statement. Further, it appears Fenton acquiesced to this statement coming in with the understanding that it was up to the jury whether they believed the statement was made. *See* N.T., Motion in Limine Hearing, 5/22/24, at 20-22; *see also* N.T., Jury Trial – Day 2, 5/29/24, at 50-53 (cross-examining Victim's father about Fenton's statement after allowing the Commonwealth to elicit such testimony from Victim's parents without objection). Accordingly, we find Fenton's claim is waived as to admission of his own statement.

*Ex-Girlfriend's Testimony About Similar Prior Abuse*

At the hearing on the motions *in limine*, the Commonwealth argued biting and chocking was Fenton's "M.O." and that his ex-girlfriend would testify that he had done it numerous times to her. *See* N.T., Motion in Limine Hearing, 5/22/24, at 13. Since Fenton's behavior was so similar on past occasions, that testimony was relevant to show an M.O. for that behavior. *See id.* at 14.

On May 28, 2024, the trial court entered an order ruling on the Commonwealth's motion *in limine* in part. Relevantly, the court withheld a decision, until an offer of proof and argument could be held at trial, on whether the Commonwealth could introduce evidence of Fenton's prior assaultive

behavior and past use of strangulation and biting behavior. **See** Order on Motions in Limine, 5/28/24, at 2.

On the third day of trial, the Commonwealth called Rachel Nortum, who had dated Fenton for three or four months just before he started to date Victim. Nortum testified that Fenton would bite her on her thighs and cheek when he was angry during sex. **See** N.T., Jury Trial – Day 3, 5/30/24, at 194-95. Nortum eventually reported this behavior to the police. **See id.** at 195-96. Fenton did not object at any point to this testimony.

On the final day of trial, the court relevantly instructed the jury that the testimony given by Fenton's ex-girlfriend that he engaged in biting behavior was in front of them "for a limited purpose, and that is for the purpose of tending to show that there's a pattern of biting behavior by [Fenton]." N.T., Jury Trial – Day 5, 6/3/24, at 66. The court specified "[t]his evidence must not be considered by you in any way other than the purpose I just stated, and you must not regard this evidence as showing that [Fenton] is a person of bad character or criminal tendencies from which you might be inclined to infer guilt." **Id.**

We note, "a motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and definitively rules on the motion. Conversely, if the trial court defers ruling on a motion *in limine* until trial, the party that brought the motion must renew the objection at trial or the issue will be deemed waived on appeal."

*See Blumer v. Ford Motor Company.*, 20 A.3d 1222, 1232 (Pa. Super. 2011) (citations omitted).

We reiterate that Fenton did not bring the motion *in limine* regarding the instant evidence. While he did object to the admission of this evidence at the hearing on the motion *in limine*, the trial court deferred a ruling as to the testimony from Fenton's ex-girlfriend until trial. Our review of the trial transcript indicates that Fenton did not renew any objection to this testimony at trial, nor did he ask for a definitive ruling on the motion *in limine*. Accordingly, we find this assertion of error was not properly preserved at the trial level. *See* Pa.R.E. 103.

In any event, we would conclude the trial court did not err in admitting this evidence. Nortum's testimony that Fenton had a pattern of biting people he was in a relationship with was relevant to prove malice, motive, and common scheme. *See Commonwealth v. Einhorn*, 911 2d 960, 967 (Pa. Super. 2006) (finding "trial court was well within its discretion to admit evidence of [defendant]'s past violence against women in order for the prosecution to prove a common scheme.").

Further, the court provided the jury with a limiting instruction, so they understood that the challenged testimony was not to be used to demonstrate Fenton had violated the law or to prove any crimes that occurred prior to the charged offenses. *See id.* ("The law presumes that the jury will follow the

instructions of the court.") (citation omitted). Based on the above, the objectionable testimony was properly admitted at trial.

**Sufficiency of the Evidence**

In his last issue, Fenton complains there was insufficient evidence to support his third-degree murder conviction. ***See*** Designated Appellant's Brief, at 54. In reviewing a sufficiency challenge, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Palmer***, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted). Therefore, we will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Commonwealth v. Bruce***, 916 A.2d 657, 661 (Pa. Super. 2007) (citation omitted).

Third-degree murder is defined as:

> All other kinds of murder other than first degree murder or second degree murder. The elements of third-degree murder, as developed by case law, are a killing done with legal malice. Malice exists where there is a particular ill-will, and also where there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Malice is established where an actor consciously disregard[s] an unjustified and extremely high risk that his action might cause death or serious bodily harm. Malice may be inferred by considering the totality of the circumstances.

*Commonwealth v. Golphin*, 161 A.3d 1009, 1018 (Pa. Super. 2017) (citations and quotations omitted); *see also* 18 Pa.C.S.A. § 2502(c). On appeal, Fenton concedes that Victim is deceased, and also that the jury found him guilty of killing Victim and that that credibility determination was reserved for the jury. *See* Designated Appellant's Brief, at 56. Accordingly, Fenton's only contention on appeal is that the Commonwealth failed to establish that he acted with "malice" in causing the death of Victim. *See id.*

We note, throughout the discussion of his sufficiency argument, Fenton cites little or no specific authority supporting his actual assertions in violation of Pa.R.A.P. 2119. Other than citing some general case law for broad propositions related to sufficiency arguments in general, and the definitions of third-degree murder and malice, the brief does not adequately give us pertinent citation that contains facts related to Fenton's particular case and contention. His argument is accordingly no more than undeveloped assertions. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) ("[A]rguments which are not properly developed are waived.") (citation omitted).

To the extent we can understand Fenton's challenge to the sufficiency of the evidence, we find his contentions without merit. Fenton argues the trial evidence was deficient in establishing malice because Nurse Cheryl Wier testified that she could not conclude strangulation was the cause of death. *See* Designated Appellant's Brief, at 57. Fenton mischaracterizes this testimony. Nurse Wier testified that she could not conclude strangulation was the cause of death because she did not perform a strangulation assessment, and as such was not hired to testify to whether or not Victim was strangled. *See* N.T., Jury Trial – Day 3, 5/30/24, at 130. Nurse Wier clarified that she could not perform a strangulation assessment, which requires asking the patient a series of questions, simply because of the state Victim was found in, critical and unconscious; not because of any finding one way or another whether Victim was strangled.

Fenton admits the jury found his "stair fall" explanation incredible based in part on the significant expert testimony provided by the Commonwealth to rebut that explanation. *See* Designated Appellant's Brief, at 58. However, Fenton insinuates that the doctor who performed the autopsy opined the manner of death was homicide solely based on the inconsistency between Fenton's version of what happened that he provided to officers at the scene and the doctor's observed injuries to Victim. *See id.* at 58. Fenton again mischaracterizes this testimony.

Katherine Maloney testified as an expert about the autopsy she performed on Victim. Importantly, Maloney testified about the "blunt impact injuries" she observed on Victim's head, neck and upper chest. *See* N.T., Jury Trial – Day 4, 5/31/24, at 16. Maloney specified that there was direct trauma to Victim's "growth", neck and chest. *See id.* at 18. Maloney testified extensively about her observations of Victim, including bruising and bite marks on her hands and nose, *see id.* at 26-27, patterned bruising on her torso, that likely came from an object, *see id.* at 28-33, and that an examination of her internal organs did not reveal anything consistent with cause of death or anything that would have contributed to her death, and showed Victim was otherwise healthy. *See id.* at 34.

Importantly, Maloney testified that in her opinion, the cause of death of Victim was a hemorrhage due to blunt trauma to Victim's head and neck, and the large tumor she had on her head and neck. *See id.* at 35. Maloney clarified that it was a hemorrhagic complication of blunt impact injuries to the head and neck in the setting of a neurofibroma. *See id.* at 35-36. Maloney then testified that the manner of death, in her opinion, was homicide. Maloney clarified that she reached this conclusion because the extensive injuries that she detailed were consistent with inflicted trauma "at the hands of another," and there was no explanation given for how those observed injuries could have occurred other than "non-accidental inflicted trauma." *Id.* at 36. Maloney further explained that Victim's tumor was not the type that would normally

spontaneously burst, and the fact that it was covered with injuries, along with injuries to her neck, was consistent with blunt impact injuries to the tumor. *See id.* at 36-37. Finally, Maloney opined that Victim's injuries were not consistent with a fall down the stairs. *See id.* at 38.

The significant amount of evidence, while circumstantial, was sufficient to prove third-degree murder, including malice. *See* N.T., Jury Trial – Day 2, 5/29/24, at 16-21 (Victim's statements in her diary that Fenton harmed and raped her); *see id.* at 37-38, 47 (Victim's statements that Fenton had previously choked her); *see id.* at 13-16, 41 (Fenton's previous threat to Victim about kicking her down the stairs to "end her" based on his knowledge of a vulnerable tumor on her head); *see id*. at 137-143 (Fenton's cousin testifying that he spent the night prior to Victim's death drinking with Victim and Fenton at their home, and that Fenton was agitated with Victim, leading the cousin to leave because he was uncomfortable with their bickering); *see id.* at 91-108, 112-114, 123, 172, 195-238 (significant testimony from paramedics and officers at the scene, as well as medical experts, who testified about Victim's extensive injuries, Fenton's incredible explanation that Victim had fallen down the stairs earlier in the evening, and how Victim's injuries were not consistent with the fall alleged by Fenton); *see* N.T., Jury Trial – Day 3, 5/30/24, at 161 -62 (Fenton's statements to his cellmate about how he liked to get people to submit to him by kicking, choking, and biting them, and

that he would never confess to what he did); *see id.* at 194-96 (Fenton's ex-girlfriend's testimony about Fenton's biting behavior).

Based on the above, Fenton's sufficiency challenge is without merit.

**Commonwealth's Appeal**

Finally, we address the Commonwealth's contention that the sentencing court erred or misapplied the law in calculating credit of time served applied to the instant case. A claim the court failed to properly award credit for time served implicates the legality of sentence. *See Commonwealth v. Clark*, 885 A.2d 1030, 1032 (Pa. Super. 2005).

Under the Pennsylvania Sentencing Code, "[c]redit against the maximum term and any minimum term shall be given to the defendant for all time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of conduct on which such a charge is based. Credit shall include credit for the time spent in custody prior to trial, during trial, pending sentence, and pending the resolution of an appeal." 42 Pa.C.S.A. § 9760(1).

Here, at the sentencing hearing, the Commonwealth noted that Fenton was sentenced on November 16, 2023 at docket number 403 CR 2023 to 30 days to 18 months' incarceration, for an assault he committed while in jail awaiting trial on this matter. *See* N.T., Sentencing Hearing, 8/12/24, at 19. The Commonwealth stated that there was no indication he was ever paroled on that sentence. Accordingly, the Commonwealth asserted that none of that

time should apply to the instant case, because he should not get double credit for that time. *See id.*

Fenton's counsel responded that "[t]he [sentencing] order itself indicated he was paroled at the expiration of the minimum sentence." *Id.* at 21. Therefore, counsel argued only 30 days of credit could be applied to the other case, but not the full 18 months, since "the sentencing order did grant his parole." *Id.*

At the end of the hearing, the court sentenced Fenton to 18 to 36 years' incarceration on the instant case. *See id.* at 27. The court noted that Fenton would receive credit for time served from May 11, 2021 through August 12, 2024, minus 30 days, for a total credit of 1,160 days. *See id.*

The Commonwealth thereafter filed a post-sentence motion related to the calculation of credit for time served. At a hearing on post-sentence motions, the court addressed the time credit issue. The Commonwealth clarified that while Fenton's counsel had indicated at the sentencing hearing that the sentencing order on the other case stated Fenton was "automatically paroled", the Commonwealth had since pulled up the sentencing order, and it actually states that Fenton was "eligible" for parole after serving the minimum. N.T., Post-Sentence Motion Hearing, 10/2/24, at 16. The Commonwealth asked the court to take judicial notice of a few other sentencing orders from the same sentencing judge, which did use the phrasing that the defendant was "automatically paroled" after serving the minimum. *See id.* at 16-17. The

Commonwealth further asked the court to take judicial notice of Fenton's sentencing order from the other case, which conversely stated that Fenton was "automatically *eligible* for parole" after expiration of the minimum. ***See id.*** at 17 (emphasis added). Accordingly, the Commonwealth argued that if Fenton was never actually paroled on that case, then he was still accruing time on that case after serving the minimum. ***See id.***

The Commonwealth called Officer Dina Davis, from the records department at the jail, to testify. ***See id.*** at 18. Officer Davis explained that when a defendant gets paroled from jail, someone from the probation department comes down, gives the defendant conditions, and then gives the records department a release. ***See id.*** Officer Davis further explained that the process is the same even if the defendant is not being released from jail due to serving another sentence; probation still comes down, gives the defendant conditions, and then the case is released from the system, while the defendant remains in jail. ***See id.*** at 19. Officer Davis testified that the records department never received any paperwork paroling Fenton in the other case, and she had no records that say he was paroled. ***See id.***

Following argument, the court concluded that

absent some evidence that the Probation Department had a bunch of violations, and that he was a troublesome inmate during the time that he would have been serving the sentence at 403 of 2023, the case we're calling the assault case or the strangulation case. The [c]ourt believes that the intention of Judge Pavlock was clear, that [Fenton] would serve 30 days of incarceration, and that absent some other unforeseen circumstance that he would be paroled at that time. The fact that the Probation Department didn't

- 43 -

cross all the T's and dot all the I's and file the paperwork with the jail that it ordinarily does, I don't believe changes Judge Pavlock's intention that is in his order of November 16, 2023.

*Id.* at 22. Based on the above conclusions, the court denied the Commonwealth's post-sentence motion.

After a careful review of the record, we unfortunately must disagree with the good intentions of the trial court. While we can appreciate wanting to respect the apparent intent of the sentencing judge in the other case, the fact remains that there is simply no record or evidence that Fenton was ever paroled. Accordingly, if we were to uphold the time credit as it currently stands, Fenton will have not served the parole term of his other sentence, but likely would not serve that parole term on the back end either, as there is no documentation in the system that he owes that time. As such, Fenton would have gained "double credit" for the challenged time, to which Fenton is not entitled.

> This Court has stated, "a defendant is not entitled to 'receiv[e] credit against more than one sentence for the same time served.'" ***Commonwealth v. Ellsworth***, 97 A.3d 1255, 1257 (Pa. Super. 2014) (citation omitted); ***Commonwealth v. Kunselman***, 410 WDA 2021, 2022 WL 102604 (Pa. Super. 2022) (unpublished memorandum at 12) ("[w]hile the nuances of awarding credit for time served can be daunting, the hallmark principles in awarding such credit remain as follows: (1) that pursuant to Section 9760, ***a defendant must be awarded credit for time served***, and (2) that ***credit for time served may only be awarded once***.) (citations omitted and emphases added).

***Commonwealth v. Lamont***, 308 A.3d 304, 317 (Pa. Super. 2024); ***see also id.*** at FN14 (citing Pa.R.A.P. 126(b) for the proposition that unpublished non-

precedential memoranda decision of Superior Court filed after May 1, 2019, may be cited for persuasive value).

Applying the above principles to the instant matter, Fenton was entitled to credit from May 11, 2021, the day of his arrest, through August 12, 2024. However, the trial court erred in awarding credit to Fenton for 540 days that he spent in jail, without being paroled in his other case. Since there is no record that he was paroled in that case, Fenton received credit for those days against that sentence, and therefore he is not entitled to double credit for those days in the instant matter. **See Ellsworth**, 97 A.3d at 1257.

Because there is an error with respect to 540 days of time served on the face of the record, we modify the portion of the sentencing order indicating the amount of time credit to be given to Fenton from 1,160 days to 620 days.

Accordingly, we modify the judgment of sentence in part, but affirm in all other respects, and remand for the trial court to enter a new sentencing order with the above stated time credit. **See** 42 Pa.C.S.A. § 706 ("An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may remand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.").

Judgment of sentence modified in part and affirmed in all other respects. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/23/2025